Overseers of the Poor of the Borough of Northumberland, Plffs. in Err., *v*. Overseers of the Poor of the Borough of Milton.

A mother's settlement acquired by her second marriage is not communicated to her children by her first husband, although they accompany her to and become part of the second husband's family.

A pauper born in Pennsylvania, whose parents have no settlement in the state, and who becomes a charge at the age of four months, has a settlement in the poor district where he was born, rather than in another district of the state.

(Argued April 26, 1887.   Decided May 9, 1887.)

January Term, 1886, No. 403, E. D., before MERCUR, Ch. J., GORDON, TRUNKEY, STERRETT, GREEN, and CLARK, JJ.   Error to the Quarter Sessions of Northumberland County to review a judgment confirming an order of removal of pauper.   Affirmed.

Reported below, 1 Pa. Co. Ct. 377.

This was an appeal of the overseers of the poor of the borough of Northumberland from the order of removal of Edward James Barry, a pauper.

The facts as found by the court below were stated in the opinion of ROCKEFELLER, P. J., which was as follows:

Edward James Barry, the pauper, was born in the borough of Northumberland on the 16th day of September, 1884.   His parents were both foreigners, the father, Edward Barry, being a native of Wales, and his mother a native of England.   They

NOTE.—The principle that the minor does not acquire a settlement through the stepfather on the remarriage of the mother is also recognized in Donegal Twp. v. Sugar Creek Twp. 20 W. N. C. 307, 10 Cent. Rep. 405, 11 Atl. 213; Clinton Twp. v. Delaware Twp. 1 Pa. Co. Ct. 375; Poor District v. Poor District, 6 Kulp, 169.

lived together as husband and wife in Northumberland at the time of the birth of their son. The mother died on the 24th day of January, 1885, and was buried by the overseers of the poor of Northumberland on the 26th. On the 27th the father left, and has not since been heard of. The mother of the pauper's mother also resided in Northumberland, and upon her death took charge of the pauper, who was then about four months old. This mother of the pauper's mother was married to one Peter Warters. They were very poor and were obliged to ask for assistance. Finding work at Northumberland to be scarce they moved to Milton and took the pauper along with them. An order of relief was taken out and the pauper placed on Milton for support. The overseers of the poor of Milton took out an order of removal, and removed the pauper to the borough of Northumberland, from which order the overseers of the poor of that borough appealed. Neither the pauper, his mother, father, nor grandmother ever had a settlement in Milton.

[That borough contends that the pauper had at least a quasi settlement in Northumberland, if, in fact, he was not legally settled there by reason of his birth at that place; and that the burden of finding his legal settlement is on Northumberland and not on Milton.]

The rule of course is that a pauper can only be removed to the place where he was last legally settled; but it is contended that there is an exception to this rule, as where a stranger wounded or sick must be supported by the district where he is at the time he falls helpless, etc., on the principle decided in the cases of Overseers v. McCoy, 2 Penr. & W. 432, and Versailles v. Mifflin, 10 Watts, 360, and kindred cases.

In the present case the pauper was born in Northumberland, and lived there until his mother died and was buried by the overseers of the poor, and the father, a foreigner, abandoned him. It was there that he first became helpless. The taking him to another district where he had no settlement does not make that district liable for his support. It is well settled that a pauper's settlement is the place of his birth, until it is shown that he has another. This was directly decided by the supreme court of this state in the case of Wayne Twp. v. Jersey Shore, 81* Pa. 265, a case heard and decided by me in Lycoming county a few years since.

"Where a child is first known to be, that parish must provide

for it until they find another;" by HOLT, C. J., 4 Burn's Justice of the Peace, Chitty's ed. 275, and other cases there cited.

·I am of the opinion that the point is well taken by Milton; but counsel for both sides have raised another question, one which I think there is no doubt about, but which has never been decided by the supreme court of Pennsylvania, so far as we know. Milton, having shown that the pauper was born in Northumberland, to which place he has been removed, and that that place is, by reason of his birth, prima facie his place of settlement, Northumberland contends that it has shown that his last place of settlement is in Turbut township, Northumberland county. If Northumberland is in a position to show this, as against Milton, under the circumstances, then the question arises: Is a mother's settlement, acquired by her second marriage, communicated to her children by a former husband? The facts of the case are sufficiently found in the answers of the court to the plaintiffs' and defendants' points.

[If the pauper's mother, who is a child of a first marriage, follows the settlement of her mother in right of a second husband, then the·pauper's place of settlement is Turbut township, where such second husband is legally settled by reason of having taken a lease of real estate and residing thereon for one whole year and paying the rent. That such is not the law I think is very clear.]

In the case of Wangford v. Brandon, 4 Burn's Justice of the Peace, Chitty's ed. 292, Carthew, 449, three poor men of Wangford came into the parish of Brandon and there married three poor widows of Brandon, who received relief from the said parish, each of which widows had children by their former husbands, some under seven, some above seven years of age. It was holden that the children did not gain a settlement in Wangford, nor were removable thither, to charge that parish. As to the nurse children, they might indeed be sent thither for nurture only, yet still the parish of Brandon must relieve them there, and not the parish of Wangford. But the children above the age of seven years ought not to be removed at all; being settled inhabitants in the parish of Brandon; and the removal of the mothers shall have no influence in the settlement of the children. See also the cases of Cumner v. Milton, 4 Burn's Justice of the Peace, 288, 2 Salk. 528, and Woodend v. Paulspury, 4 Burn's Justice of the Peace, 291, 2 Ld. Raym. 1473.

The case of Rex v. St. Giles in the Fields, 4 Burn's Justice of the Peace, 836, but reported fully in Burrow's Settlement Cases, page 2, was a well-considered case. There were several arguments, and all the former cases cited. "The pauper's father's settlement could not be discovered. His mother's settlement before their marriage was known. His father died. His mother married a second husband, who had a settlement, and she consequently gained a new settlement by this second marriage." It was held that children of a first marriage do not follow the settlement of their mother in right of a second husband, unless for nurture, and even then at the charge of the parish where they are legally settled. See also the case of Freetown v. Taunton, 16 Mass. 52.

In the case of School Directors v. James, 2 Watts & S. 568, 37 Am. Dec. 525, Chief Justice GIBSON premises certain principles about which he says there is no dispute. He says: "The domicil of an infant is the domicil of his father, during the father's lifetime, or of his mother during her widowhood but not after her subsequent marriage, the domicil of her widowhood continuing in that event to be the domicil of her child. A husband cannot properly be said to stand in the relation of a parent to his wife's children by a previous marriage, where they have means of support which are independent of the mother, in whose place he stands for the performance of her personal duties, because a mother is not bound to support her impotent children so long as they are of ability to support themselves. Neither can they derive the domicil of a subsequent husband from her, because her new domicil is itself a derivative one, and a consequence of the merger of her civil existence. Her domicil is his, because she has become a part of him; but the same thing cannot be said of her children. Having no personal existence for civil purposes, she can impart no right or capacity which depends on a state of civil existence; and the domicil of her children continues after a second marriage to be what it was before it."

This question, I understand, has been decided by Judge ELWELL in Columbia county, and by Judge CUMMIN in Lycoming county. It was also decided by this court in the case of Danville v. Point Twp., all following the ruling of the cases cited.

Counsel for the overseers of the poor of Northumberland contend that the question is not settled, and I suppose it will not be so considered until it is decided by the supreme court. I hope

this case will be taken up, for if we are all wrong it is time we knew it.

The later Massachusetts cases were decided, as I understand it, upon the statute of that state passed after the decision in the case of Freetown v. Taunton, above cited. The rule of the common law is not denied. There is no statute or decision in Pennsylvania changing it.

The case of Burrell Twp. v. Pittsburg, 62 Pa. 472, 1 Am. Rep. 441, is not to the point. That case only determines that a widow may acquire a settlement different from that of her husband, by complying with the terms of the act of assembly, which is communicable to her children. The widow had gained a settlement of her own after the death of her husband by leasing a house and living in the same a year and paying the rent. It was held that she, as the head of the family, was capable of acquiring such a settlement and of communicating the same to her unemancipated children. There are certain expressions in the opinion of Chief Justice THOMPSON that doubtless tend to mislead. For instance, he says: "Still we have no reported decisions which carry a derivative settlement to her children as a consequence of her settlement. Nor is there any statutory provision or decided case against it, in this commonwealth. Why, therefore, shall it not be so on principle?" Again: "There is no difference between an acquired and derivative settlement." For the last assertion he cites the case of Rex v. St. Matthew Bethnal Green, Burr. Sett. Cas. 482.

It will be seen by a reference to that case that the judges all said there was no difference between an acquired and a derivative settlement; but they were considering a case of a settlement of a man's wife derived from his. He had derived a settlement from his mother who had derived a settlement by reason of her birth. It was held that such derivative settlement was imparted to his wife and children.

No such question as is now before the court was considered in that case, or the case decided by Chief Justice THOMPSON.

[The mother of the pauper in the present case was born in England. She was a child of the first marriage of her mother, and I hold that she did not acquire the settlement of her mother in right of her second husband, according to all the authorities.]

The order of removal is confirmed.

Plaintiffs' counsel requested the court to find the following facts:

"First. Some time in the year 1879 a man by the name of Joseph J. Fawcett emigrated from England to this state and found employment as a miner at Peckville, in the county of Lackawanna. After working there about nine months, about the first of April, 1880, Fawcett was joined by his wife and their daughter, Mary Ada Fawcett, aged about thirteen years and seven months. Fawcett boarded with his father, and his family remained with him there until he was killed, about the beginning of August, 1880. Mrs. Fawcett removed about two months afterwards with her daughter to the town of Plymouth, and about four months after that again removed with her daughter to the town of Danville, where they remained twelve months. Soon after they arrived at Danville, Mrs. Fawcett married a man by the name of Peter Warters, an iron worker, employed at one of the iron mills at Danville, and she resided with him there until February, 1882, when they removed to the borough of Milton, and in a few weeks rented a house from Solomon Fairchild in the township of Chillisquaque, in Northumberland county, where they resided a full year and paid the rent, viz., $8.33 per month.

Mrs. Fawcett, now become Mrs. Warters, paid the rent personally, as she attended to the payment of the family expenses. The next spring they removed to the house of Paul Masteller in Turbut township, taking a lease of the house at a rent of $10 per month. During the year for which they had rented this house. Warters was imprisoned in the Northumberland county jail at Sunbury, but his family continued in the occupancy of the Masteller house until the end of the year, Mrs. Warters paying the rent in full. Mary Ada Fawcett continued a member of her mother's family and was at no time separated from her mother. At the same time Mrs. Warters had a boarder by the name of Edward Barry. Both Barry and Warters were iron workers, and worked at the Milton nail works. During the occupancy of the Masteller house, Mary Fawcett became pregnant by the boarder, Edward Barry. This man Barry was a foreigner and had no settlement in the state of Pennsylvania."

*Ans.* I find the facts to be as stated in this point, except that I cannot say that "Mary Ada Fawcett continued a member of her mother's family and was at no time separated from her

mother." It seems that after Mary Ada's marriage with Edward Barry, the pauper's father, they lived together as husband and wife and that she was supported by him out of his earnings. Mrs. Warters says they kept house about two months, when she took sick and came home to her. They lived in the house with her until they started housekeeping themselves.

"Second. When the lease of the Masteller house expired, April 1, 1884, Mrs. Warters with her daughter removed to the borough of Northumberland, the boarder, Edward Barry, accompanying them. On the first of the following September Edward Barry and Mary Fawcett were married in the presence of the mother, Mrs. Warters, by the Catholic priest at Sunbury, and their child was born fifteen days afterwards on the 16th day of September, 1884. The child was a boy and was named Edward James Barry. Edward Barry rented a house in Northumberland from Mr. Van Alen for whom he worked for a time and held it two months, from October 1 to December, 1884, when he gave it up. The mother of the child had failed in health and returned to the house of her mother, Mrs. Warters, where she died on the 24th day of January, 1885, less than five months from the time of her marriage.

"On the day after Mrs. Barry's burial, her husband absconded and has not since been heard of. Neither Edward Barry nor his wife nor any of the Warters family acquired a settlement in the borough of Northumberland. On the death of Mrs. Barry, Mrs. Warters took charge of her grandchild, Edward James Barry, the pauper.".

*Ans.* I find the fact as requested in this point.

"Third. After the release from prison, Peter Warters removed to Milton, having again obtained work at the Milton nail works. His wife accompanied him, remaining in charge of the child of her daughter. Shortly after settling in Milton, she applied to two justices of the peace and obtained an order of relief directed to the overseers of the poor of the borough of Milton for the support of the said child, alleged to be a pauper. The Milton overseers then took this order, from which the Northumberland overseers appealed."

*Ans.* I find the fact as requested in this point.

The plaintiffs submitted, *inter alia,* the following points of law:

"1. That the mother of the infant pauper, Edward James

Barry, derived a settlement in the township of Turbut, in the county of Northumberland, from her mother, Mary Warters, intermarried with Peter Warters, who bona fide took a lease of a house in the said township and lived therein for one full year at an annual rent exceeding $10 and paid the said rent, the said Mary Fawcett not having been emancipated or become independent of her said mother's family."

*Ans.* I do not find the law to be as stated in this point.

"2. That the maiden settlement of the said Mary Ada Fawcett, in Turbut township, was not lost by reason of her marriage to Edward Barry, he being a foreigner and having no settlement in this state, but continued at the time of the birth of her child and up to the date of her death."

*Ans.* I find that Mary Ada Fawcett had no maiden settlement in Turbut township. If she had acquired one, it would not have been lost by reason of her marriage to Edward Barry, he having no settlement in this state or elsewhere.

The defendants' points were, *inter alia,* these:

"1. The mother of this infant pauper having died in destitute circumstances in the borough of Northumberland, and the overseer of the poor of said borough having taken charge of her remains, and buried her at the expense of the poor district, and appropriated her property under the poor laws, and the pauper who was then only four months old was abandoned by its father in the borough of Northumberland, immediately upon the death of its mother, it first became helpless and destitute in the borough of Northumberland; and the poor district of the borough of Northumberland was bound to support it until it was removed to the place of its last settlement."

*Ans.* This point is answered as requested.

"2. The overseers of the borough of Northumberland, which poor district was bound to support the pauper until removed to the place of its last legal settlement, sent the pauper and the person in whose charge it was, to the borough of Milton; where an order of relief was immediately taken out, and the pauper placed on the Milton borough poor district, although it had no settlement in the borough of Milton. It was proper to remove it from Milton to Northumberland, and impose upon Northumberland the burden of finding its place of last legal settlement."

*Ans.* I answer this point as requested, except that I cannot find that the overseers of the poor of the borough of Northum-

berland sent the pauper and the person in whose charge he was to the borough of Milton.   It seems that they, the overseers, or one of them, had the goods of Mr. and Mrs. Warters, in whose charge the pauper was, taken to the depot; they went to Milton to obtain work, and the taking of the goods to the depot was at the request of Mrs. Warters.

"5. A mother's settlement acquired by her second marriage is not communicated to her children by a former husband, although the children by her former husband accompany her to and become a part of his family."

*Ans.* I affirm this point.

"6. It appearing by competent evidence that the pauper was born in the borough of Northumberland, and was only four months old at the time it became a charge, and neither its father nor mother having a settlement in Pennsylvania, the borough of Northumberland is the place of settlement of the pauper, and it was properly removed from Milton to Northumberland."

*Ans.* This point is affirmed.

The plaintiffs below, the overseers of the poor of the borough of Northumberland, took this writ, and assigned as error the portions of the opinion inclosed in brackets, the answers to the plaintiffs' points of law quoted and the defendants' points quoted, and the action of the court in confirming the order of removal.

*J. Nevin Hill,* for plaintiffs in error.—The minor child of a woman by a former husband takes her mother's settlement acquired by a second marriage, the child continuing with the mother, becoming a member of the stepfather's family, and having no other settlement or domicil in the state.

The mother of the pauper in this case had a settlement in Turbut township, where she resided as a member of her stepfather's family while yet a minor and before her marriage to the pauper's father, who was a foreigner.·   She was also a foreigner, and the birth settlement of the pauper is conclusive.

Under the common law the poor were sustainable "by parsons, rectors of the church, and the parishioners, so that none of them die for default of sustenance:" (Mirror); while settlements arose under acts of Parliament, the intention of which seems to have been to confine persons to the parishes where they were born, and to drive them back, when, as mendicants, they wan-

dered into other places. King v. St. George, 5 Nev. & M. 66; 43 Eliz. chap. 2; 4 Burn's Justice of the Peace, 270, ed. 1837; 13 & 14 Charles II., chap. 12.

A settlement is the right, acquired in any one of the modes pointed out by the poor laws, to become a recipient of the benefit of those laws, in that parish or place which provides for its own poor, where the right has been last acquired. It is not forfeitable, and may be communicated from person to person, notwithstanding an attainder, which works a forfeiture of most civil rights. 4 Burn's Justice of the Peace, 270.

In England it was determined that derivative settlements extend only to natural relations, and the courts excluded children from the settlement of their mother derived from a second husband. St. George's v. St. Katherine's, 4 Burn's Justice of the Peace, 291.

This case and also that of Woodend v. Paulspury, 4 Burn's Justice of the Peace, 291, 2 Ld. Raym. 1473, decided that children follow the mother after the death of the father and up to the time of her marriage.

But when the widow remarried, the courts held, in effect, that she no longer owed any duty to her children; that she was not entitled to their custody, and could not give them sustenance without permission of her husband. Maine, Ancient Law, p. 159.

Under the common law the condition of women, under coverture, was a condition of status. Since the Revolution the wife has been proceeding from the condition of status to that of contract. Acts of April 11, 1848 (P. L. 536); April 22, 1850 (P. L. 553); April 25, 1850 (P. L. 571); April 15, 1851 (P. L. 675); Oct. 28, 1851 (P. L. 725); May 4, 1855 (P. L. 430); April 11, 1856 (P. L. 315); April 22, 1863 (P. L. 533).

Therefore, the reasons which led the English courts to exclude the wife's children by a former husband from the stepfather's family are obsolete; these reasons were based upon common-law considerations, which have been modified and overturned by our legislation and customs, and not upon the statutes themselves; and therefore our statute is to be read by the light of the present constitution of the family, the maxim being *Cessante ratione legis cessat ipsa lex.*

Domicil, residence, and settlement each differ from the other. The first two depend upon fact and intention, the last is regu-

lated and determined by the poor laws. Little, if anything, respecting settlements is left to be determined from ancient usage, or by analogy. Juniata County v. Delaware Twp. 107 Pa. 68.

There is no essential difference between a derivative and an acquired settlement.

After the death of a father, the mother of the children has the immediate charge and control of them; hence, they accompany her. Does she lose control of her children, and is she relieved of the burden of caring for them, by contracting a new marriage? The English courts virtually held to that position, and the courts of Massachusetts followed their decisions. But it is to be noted that the courts in Massachusetts declared the law otherwise upon the passage of an act of their legislature (Rev. Stat. chap. 45, § 1), which directed that "legitimate children shall follow and have the settlement of their father, if he shall have any within this commonwealth, until they gain a settlement of their own; but if he shall have none, they shall, in like manner, follow and have the settlement of their mother, if she shall have any." Plymouth v. Freetown, 1 Pick. 197; Great Barrington v. Tyringham, 18 Pick. 264; Goshen v. Richmond, 4 Allen, 458.

It cannot be contended that this statute changed the law as to the powers of the mother over her children, or of their duties to her, or of her right to give them sustenance without the consent of her second husband; and it did not declare that, after a second marriage, she should be the head of the family she brought to her husband's house.

When children have no other settlement in the state, are dependent upon the mother, and are members of the stepfather's family, the stepfather stands *in loco parentis* to them. Lantz v. Frey, 14 Pa. 201; 2 Kent, Com. 192; Stone v. Carr, 3 Esp. 1; Cooper v. Martin, 4 East, 76; Douglas's Appeal, 82 Pa. 169; Duffey v. Duffey, 44 Pa. 402; Beard's Estate, 1 Pa. Co. Ct. 283.

The court below was clearly in error in deciding that Northumberland was the quasi settlement of the pauper, and that the burden was therefore on that district to find the place of last legal settlement, without determining as a condition precedent to such a conclusion of law that the pauper had no legal settlement in the state; for if a pauper has a legal settlement he can have no quasi settlement, as the latter is a mere expedient. Overseers v. McCoy, 2 Penr. & W. 432, and Versailles v. Mifflin, 10

Watts, 360, were cases of foreigners.  See Nippenose Twp. v. Jersey Shore, 48 Pa. 402.

The place of birth in Pennsylvania is not necessarily the place of settlement.  It is only in case the parents have no settlement, or in case their settlement cannot be found, that the district of the birth is held to be the place of settlement; and then only until the proper place can be found.  Limestone Twp. v. Chillisquaque, 87 Pa. 294; Reading v. Cumree, 5 Binn. 81.

In ascertaining the proper place of settlement of a person not *sui juris* the rule is that the district where the pauper has become regularly chargeable must ascertain: (1) The settlement of the father; if this cannot be found, (2) the settlement of the mother, and this search failing, (3) the place of birth.  "And in many cases proof of the place of birth will afford but slight evidence of settlement, though of course it may be acted upon if no proof tending to fix the settlement elsewhere be offered."  4 Burn's Justice of the Peace, 274.

The place of birth is held to be prima facie the place of settlement because it is presumed the parents were settled there; and if no other settlement is found, this presumption is conclusive.

*McClerry & Voris,* for defendants in error.—By the general law relating to the support of the poor, it is the duty of the overseers to provide for every poor person within their respective districts; and especially, when from age, disease, infirmity, or other disability, such poor person is unable to work.  This is required independent and irrespective of the place of settlement, and, in case of emergency, independent and irrespective of any previous order for that purpose.  Act of June 13, 1836, §§ 1, 4, 5, 23, Purdon's Digest, 1343; House of Employment v. Murry, 32 Pa. 182.

A contract for the maintenance of a pauper child is not forbidden by the law.  The order of maintenance ought to have been taken out by the overseers; it would be their voucher in the settlement of their accounts with the township.  Roxborough Twp. v. Bunn, 12 Serg. & R. 296.

Wherever a person by reason of age, infirmity, or injury, or by reason of having applied for relief to the overseers, first becomes chargeable, it is the duty of the overseers of such place to furnish him support until he is removed to the place of his

last legal settlement; and this gives him a settlement in such place as to all the commonwealth, except the place of his last legal settlement—call it quasi settlement or what you please. Kelly Twp. v. Union Twp. 5 Watts & S. 535; Milton v. Williamsport, 9 Pa. 46.

The settlement of a pauper is prima facie the place of his birth until another be shown, acquired derivatively, or by acts of his own.   Wayne Twp. v. Jersey Shore, 81* Pa. 264.

A mother's settlement acquired by a second marriage is not communicated to her children by her former husband, although such children accompany her to and become a part of his, the second husband's, family.   Rex v. St. Giles' in the Fields, Burr. Sett. Cas. 2; Wangford v. Brandon, 4 Burn's Justice of the Peace, 292, Carthew, 449, and Cumner v. Milton, 4 Burn's Justice of the Peace, 288, 2 Salk. 528; Woodend v. Paulspury, 4 Burn's Justice of the Peace, 291, 2 Ld. Raym. 1473.

The settlement that a child takes from its parent is a deduction from the statute, for it is not so expressly provided.   Burrell Twp. v. Pittsburg, 62 Pa. 474, 1 Am. Rep. 441.

Our system of poor laws had its origin in that of England, and as many of her statutory provisions were re-enacted here, we must turn to some of them to have a view of the whole ground in contest.   Heidleberg v. Lynn, 5 Whart. 432, 34 Am. Dec. 566.

A wife's domicil is her husband's because she has become a part of him; but the same thing cannot be said of her children by a former marriage.   Having no personal existence for civil purposes, she can impart no right or capacity which depends on a state of civil existence, and the domicil of her children continues after a second marriage what it was before it.   School Directors v. James, 2 Watts & S. 570, 37 Am. Dec. 525.

In Wayne Twp. v. Jersey Shore, 81* Pa. 265, the court decided that the pauper would not take the residence of his mother, acquired by her second marriage, he being the child of her first husband.

The question was squarely decided by the supreme court of Massachusetts, following the decisions of the English courts, at a time when the laws of that state were similar to those of Pennsylvania at present.   Freetown v. Taunton, 16 Mass. 52.

*J. N. Hill*, in reply.—The cases of Kelly Twp. v. Union Twp.

5 Watts & S. 535, and Milton v. Williamsport, 9 Pa. 46, are not in conflict with the rule in Nippenose v. Jersey Shore, 48 Pa. 402, cited by us.   Both were cases where orders of relief had been taken out and the paupers had been regular charges upon the respective districts.

The question respecting the right of settlement of a child of a widow who remarries now comes for the first time into this court for a decision under our act of 1836, in the light of the present condition or constitution of the family; and, therefore, this court is perfectly free to declare the law as it now is, according to the legislative intent, unhampered by the construction put upon the English law 200 years ago.

PER CURIAM:

The opinion of the learned judge below is well fortified by sound reason and authority, and on that opinion the judgment is affirmed.